**Opinion issued December 31, 2025**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00176-CV

————————————

**A.H.D. HOUSTON, INC. D/B/A CENTERFOLDS, DWG FM INC. D/B/A SPLENDOR, D. HOUSTON INC. D/B/A TREASURES, A.H.D. HOUSTON, INC. D/B/A CENTERFOLDS, AND W.L. YORK, INC. D/B/A COVER GIRLS, INCORRECTLY NAMED AS A.H.D. HOUSTON, INC. D/B/A CENTERFOLDS, DWG FM INC. D/B/A SPLENDOR, D. TEXAS INVESTMENTS, INC. D/B/A TREASURES, A.H.D. HOUSTON, INC. D/B/A TREASURES, AND W.L. YORK, INC. D/B/A TREASURES, Appellants**

**V.**

**JAIME MIDDLETON, CORA SKINNER, JAMILLETTE GAXIOLA, JENNIFER ZHARINOVA, JESSICA HINTON, LINA POSADA, LUCY PINDER, PAOLA CANAS, SANDRA VALENCIA, TIFFANY TOTH, CIELO JEAN GIBSON, MAYSA QUI, ELIZABETH TURNER, EMILY SEARS, GEMMA LEE FARRELL, AND JACLYN SWEDBERG, Appellees**

---

**On Appeal from the 157th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-71429**

---

**MEMORANDUM OPINION**

Appellants, A.H.D. Houston, Inc. d/b/a Centerfolds, Dwg Fm Inc. d/b/a Splendor, D. Houston Inc. d/b/a Treasures, A.H.D. Houston, Inc. d/b/a Centerfolds, and W.L. York, Inc. d/b/a Cover Girls, incorrectly named as A.H.D. Houston, Inc. d/b/a Centerfolds, Dwg Fm Inc. d/b/a Splendor, D. Texas Investments, Inc. d/b/a Treasures, A.H.D. Houston, Inc. d/b/a Treasures, and W.L. York, Inc. d/b/a Treasures (collectively "appellants" or "the Clubs") appeal from the trial court's order granting summary judgment in favor of appellees Jaime Middleton, Cora Skinner, Jamillette Gaxiola, Jennifer Zharinova, Jessica Hinton, Lina Posada, Lucy Pinder, Paola Canas, Sandra Valencia, Tiffany Toth, Cielo Jean Gibson, Maysa Qui, Elizabeth Turner, Emily Sears, Gemma Lee Farrell, and Jaclyn Swedberg (collectively "appellees" or "the Models") on their affirmative claims of invasion of privacy by misappropriation and negligence and awarding $1,405,000.00 in damages. Appellants raise three issues on appeal. First, they contend that the trial court erred in granting summary judgment on appellees' misappropriation claim because the evidence of commercial benefit was not conclusive and the Clubs presented evidence that the social media posts using the Models' images did not confer a commercial benefit on the Clubs that they would not have otherwise received. Second, they assert that the trial court erred in granting summary judgment on the Models' negligence claim because the Clubs presented evidence that a third-

2

party vendor was responsible for promoting the Clubs on social media and was solely responsible for the social media posts at issue. Third, the Clubs assert that the trial court improperly awarded damages to the Models in excess of $1.4 million as a matter of law because (1) the Models' summary judgment motion requested that damages be determined by a jury, (2) the unliquidated damages were a fact issue for the jury because the damages sought are highly subjective and not readily susceptible to objective, conclusive calculation, (3) the expert reports submitted in support of the Models' damages claims are conclusory, speculative, unreliable, and full of analytical gaps and unsupported inferences, (4) no evidence in the record supports $575,000.00 of the $1,405,000.00 awarded in the judgment, and (5) the Clubs presented evidence from each Model's deposition testimony stating that she suffered no damage as a result of the social media posts.

We reverse the judgment and remand for a new trial on liability and damages.

## Background

Appellants own and operate the adult entertainment establishments known as Treasures, Centerfolds, and Splendor in Harris County, Texas ("the Clubs"). Appellees are professional models and social influencers who earn a living by commercializing their images to endorse, promote, and advertise products and businesses in exchange for compensation.

3

## A.     The Lawsuit

In October 2017, the Models sued appellants asserting claims for invasion of privacy by misappropriation, negligence/respondeat superior liability, and theft. Their petition alleged that appellants misappropriated the Models' images and likenesses over a period of several years by placing doctored images on the Internet and the Clubs' social media posts—making it appear as if the Models were working as strippers in the Clubs or endorsed the Clubs—to promote the Clubs, and did so without the Models' consent.  They alleged that appellants' misappropriation of their images and likenesses was neither incidental nor for a newsworthy purpose; rather, it was done for the value associated with them.  With regard to their negligence claim, the Models alleged that appellants owed them a duty to ensure that their advertising and promotional materials and practices did not infringe on the Models' privacy rights, and they breached their duty of care by (1) failing to promulgate, enforce, or adhere to policies and procedures concerning the misappropriation of images, (2) communicate the policies and procedures to their employees, and (3) supervise their employees to ensure compliance.  The Models further alleged that appellants had a duty to the members of the public to refrain from misappropriating the Models' images, they violated that duty by negligently hiring, screening, retaining and training their employees and agents, and they were liable for the conduct of their employees or agents under the theory of respondeat superior.  With

4

regard to their theft claim, the Models alleged that appellants unlawfully appropriated the Models' images and unlawfully obtained their services pursuant to Texas Civil Practices and Remedies Code section 134.002(2). The Models sought past and future pecuniary damages resulting from the unauthorized use of their images and likenesses as well as exemplary damages.

In their amended answer, appellants asserted a general denial and raised several affirmative defenses, pleading that (1) the Models consented to the public use and dissemination of their photographs and therefore relinquished their rights to the photographs and to their likenesses, (2) any use of the Models' photographs by the Clubs did not involve the character, personality, or reputation of the Models, (3) the Clubs did not use the photographs for a commercial benefit, (4) the Models suffered no commercial harm or damages, (5) the Models' claims were barred because they were paid for the photographs and for a release of their rights to the photographs and their likenesses, (6) the Models' alleged injuries were caused in whole or in part by the negligence of a third party, Genesis Real World Corporation ("Genesis"), (7) the Models' damages, if any, should be reduced because of their comparative and/or contributory negligence and their failure to mitigate their damages, and (8) the Models' claims were barred by the doctrines of unclean hands, waiver, and estoppel.

**B.     Summary Judgment Proceedings**

The Models moved for traditional summary judgment on their claims of invasion of privacy by misappropriation and negligence/respondeat superior liability in August 2021.[1]  As to their misappropriation claim, the Models asserted that they had established all three elements of their claim because the summary judgment evidence conclusively showed that (1) appellants had appropriated the Models' names or likenesses for their value rather than incidentally or for a newsworthy purpose, (2) the Models could be identified from the publication, and (3) appellants received an advantage or benefit as a result of the misappropriation.  The Models asserted that they met all of the elements of their negligence claim because the evidence demonstrated that (1) appellants owed them a duty of care to ensure that their advertising and promotional materials and practices did not infringe on the Models' privacy rights, (2) they breached their duty of care by (a) failing to promulgate, enforce, or adhere to policies and procedures concerning the misappropriation of images, (b) communicate the policies and procedures to their employees, and (c) supervise their employees to ensure compliance, and (3) appellants' breach proximately caused damages to the Models.  They asserted that appellants were also liable under the doctrine of respondeat superior because their agent, Genesis, was acting within the course and scope of its employment with

---

[1]     The Models did not move for summary judgment on their theft claim.

6

appellants when it posted the Models' images on the Clubs' websites and social media accounts and their actions were in furtherance of appellants' businesses. The Models also moved for summary judgment on their negligent undertaking claim. The summary judgment evidence attached to the Models' motion consisted of their sworn declarations and accompanying attachments, excerpts from the deposition testimony of Crystal Cowart, appellants' designated corporate representative ("Cowart") and accompanying exhibits, Treasures's Image Rights Release, and the expert reports of Stephen Chamberlin ("Chamberlin").[2]

In his reports, Chamberlin stated:

- he was asked to determine the fair market value of the Models' images used by appellants in connection with the social media accounts for their clubs;

- his opinions, analysis, and conclusions were based upon a review of the images and of supporting documentation, discussions with each Model

---

[2] Chamberlin prepared three expert reports: the "Splendor Report" (Exhibit S), the "Centerfolds Report" (Exhibit T), and the "Treasures Report" (Exhibit U). While it is undisputed that the Splendor and Centerfolds Reports were filed in the trial court prior to the summary judgment hearing and are part of the appellate record, appellants disputed that the Treasures Report was properly filed or proffered to the trial court prior to entry of judgment.

After the Models requested that a supplemental record containing Exhibit U be filed in this Court, we abated the appeal under Texas Rule of Appellate Procedure 34.5(e), directing the trial court to hold a hearing to determine "whether Exhibit U was part of the summary judgment record." Following a hearing, the trial court entered an order memorializing its findings that Exhibit U was properly before the court during the summary judgment hearing and that it was lost or destroyed after the summary judgment hearing. We reinstated the appeal and granted appellants thirty days to file a supplemental brief addressing Exhibit U.

7

as well as agency representatives and other individuals in the modeling and talent industries, an assessment of the Models' current career station, and personal factors that would impact a fair market value negotiation;

- the documents he considered in calculating damages included other clients' contracts and agreements with the Models, contractor 1099 forms, employee W-2 forms, earnings statements, and releases and related records, where available; and

- determining the fair market value of appellants' use of the Models' images required him to attempt to recreate a negotiation process that did not occur.

Chamberlin's reports further stated that his determinations of fair market value for each Model's images used by appellants "are based on a number of factors and are estimations in support of actual damages sustained by the Models . . . ."

In their summary judgment response, appellants asserted that the Models were not entitled to summary judgment on their misappropriation claim because they failed to provide any evidence that appellants had received a commercial benefit from the complained-of posts that, without such posts, appellants would not have otherwise received. As to the Models' negligence/respondeat superior claims, appellants argued that a genuine issue of material fact existed regarding whether appellants breached any duty owed to appellees because Genesis, the third-party vendor appellants hired to advertise the Clubs on social media, acted outside the scope of the parties' agreement and its authority when it posted the Models' images to the Clubs' social media pages without first obtaining releases from them. They

8

further asserted that the Models had failed to provide any evidence that they suffered injury or damage as a result of the social media posts. Appellants attached excerpts from Cowart's deposition and the Models' depositions as summary judgment evidence.

The trial court held a hearing on the Models' motion for summary judgment on October 22, 2021.[3] At the conclusion of the hearing, the trial court asked the parties to submit additional briefing, specifically, to address whether the determination of the "commercial benefit" element of a misappropriation claim is a question of fact or of law.

In their supplemental briefing, the Models argued that the summary judgment evidence established as a matter of law that appellants received a benefit or advantage as a result of the misappropriation of the Models' images. They asserted that the "benefit" element requires a plaintiff to prove that the defendant derived some commercial benefit from the use of the plaintiff's name or likeness as opposed to receiving no commercial benefit because the use was incidental. The Models asserted that appellants' use of their images was commercial and anything but incidental. They asserted that Cowart's testimony demonstrated that the use of their

---

[3] At the hearing, the trial court also heard appellants' motion for leave to designate Genesis as a responsible third party. The court took judicial notice that appellants had designated Genesis as a potential responsible party on July 19, 2020. The lawsuit was filed in 2017. Noting that the statute of limitations barred suit against Genesis, the trial court denied appellants' motion.

9

images was clearly intended to bring patrons into the Clubs by convincing them that the Models would actually appear at the Clubs as dancers. The Models emphasized that they were not required to show that appellants made money from the commercial use of their images or likenesses. The Models argued that the uncontroverted summary judgment evidence showing that the Models were not compensated for appellants' repeated use of their images over a period of years, without their permission, to advertise their Clubs and the events taking place there met the "commercial benefit" standard.

In their supplemental briefing, appellants asserted that the Models were not entitled to summary judgment on their misappropriation claim because appellants presented more than a scintilla of evidence creating a fact issue as to whether appellants received some advantage or benefit from their use of the Models' images or likenesses in the Clubs' social media posts. In support of their assertion, appellants pointed to Cowart's testimony that, based on her twenty years of experience in the adult entertainment industry, the Clubs did not need to advertise. Appellants asserted that the Models produced no evidence that more patrons came to the Clubs or that the Clubs' revenue increased as a result of the social media posts using their images. Appellants argued that the social media posts were simply inconsequential to the Clubs.

The trial court granted the Models' traditional motion for summary judgment as to liability and damages on their claims for misappropriation and negligence/respondeat superior liability. The trial court entered its final judgment, which stated, in part:

A. IT IS THEREFORE ORDERED that Plaintiffs['] Motion for Summary Judgment against Defendants for Right to Privacy—Misappropriation is GRANTED.

B. IT IS FURTHER ORDERED that Plaintiffs['] Motion for Summary Judgment against Defendants for Negligence is GRANTED.

C. IT IS FURTHER ORDERED that Plaintiffs['] Motion for Summary Judgment against Defendants for Negligence Respondeat Superior is GRANTED.

D. IT IS FURTHER ORDERED that Plaintiffs are awarded monetary damages as presented in their Summary Judgment Evidence as follows:

| Plaintiff | Damages |
|---|---|
| Skinner | $160,000 |
| Middleton | $60,000 |
| Gaxiola | $30,000 |
| Zharinova | $15,000 |
| Hinton | $200,000 |
| Posada | $210,000 |
| Pinder | $40,000 |
| Canas | $105,000 |
| Valencia | $45,000 |
| Toth | $240,000 |
| Farrell | $40,000 |
| Sears | $20,000 |
| Swedberg | $100,000 |
| Quy | $40,000 |
| Gibson | $60,000 |

| Turner | $40,000 |
|---|---|

Appellants moved for a new trial, arguing that the trial court erred in granting summary judgment in favor of the Models and awarding more than $1.4 million in damages. With respect to the misappropriation claim, appellants asserted that the Models had failed to present uncontroverted evidence that appellants had received a commercial benefit from the alleged misappropriation of the Models' images. They further asserted that Cowart's testimony that the Clubs received no commercial benefit and that the advertisements were inconsequential to the Clubs created a fact issue precluding summary judgment on the Models' misappropriation claim. As to the negligence/respondeat superior claim, appellants argued that the summary judgment record showed that appellants had hired Genesis, a third-party vendor, to promote and market the Clubs on social media, Genesis alone handled the selection and posting of images for advertising purposes, and Genesis acted outside the scope of its authority when it posted the images without first obtaining releases from the Models. Appellants argued that this evidence raised a material fact issue on the Models' negligence claim precluding summary judgment. Finally, appellants asserted that the trial court erred in awarding damages to the Models for several reasons. First, the damages in this case were unliquidated, subjective, not subject to precise calculation, and could not be decided as a matter of law. Second, in their summary judgment motion, the Models specifically requested that the question of

12

damages be submitted to the jury and, thus, by awarding damages in its final judgment, the trial court impermissibly awarded more relief than was requested in the motion. Third, the only evidence of damages was the Models' expert reports, which were unreliable, speculative, conclusory, and hearsay. Lastly, appellants' summary judgment evidence included excerpts from each Model's deposition testimony stating that she suffered no damages as a result of the alleged misappropriation, which directly controverted the evidence the Models produced to support their claimed damages. Appellants asserted that the Models failed to establish their entitlement to and the amount of damages as a matter of law.

In their response to appellants' motion for new trial, the Models argued that appellants were not entitled to an evidentiary hearing because their new trial motion was merely an attempt to assert, for the first time, objections to the Models' summary judgment evidence and challenge the Models' expert's qualifications. They asserted that appellants' motion failed to show good cause as required by Texas Rule of Civil Procedure 320. According to the Models, they conclusively showed that appellants received a commercial benefit from the use of the Models' images that they would not otherwise have received. They further asserted that they requested summary judgment on damages and conclusively proved the amount of

damages to which they were entitled. Lastly, they argued that appellants had waived any *Daubert*[4] challenge to the Models' expert.

The trial court held a hearing on appellants' motion for new trial on February 18, 2022. Appellants' motion for new trial was subsequently overruled by operation of law.

This appeal followed.

## Summary Judgment Standard

We review the trial court's grant of a summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007). To prevail on a traditional summary judgment motion, the movant bears the burden of proving that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). Thus, a plaintiff moving for summary judgment on its own claim must conclusively establish each element of that claim. *Clarent Energy Servs., Inc. v. Leasing Ventures, LLC*, No. 01-18-00821-CV, 2020 WL 1173706, at *6 (Tex. App.—Houston [1st Dist.] Mar. 12, 2020, no pet.) (mem. op.). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).

---

[4] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

14

If the movant meets its burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). To determine if the nonmovant raised a fact issue, we review the evidence in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Mann Frankfort*, 289 S.W.3d at 848 (citing *City of Keller*, 168 S.W.3d at 827). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002) (citing *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997)). A genuine issue of material fact is raised when the nonmovant produces more than a scintilla of evidence regarding the challenged element. *Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex. 2012). More than a scintilla of evidence exists when reasonable and fair-minded individuals could differ in their conclusions. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

## Misappropriation Claim

In their first issue, appellants contend that the trial court erred in granting summary judgment on the Models' misappropriation claim. They assert that the Models failed to conclusively prove that the Clubs received a commercial benefit from the social media posts containing the Models' images or likenesses that they

would not have otherwise received. Appellants assert that their summary judgment evidence showed that the Clubs received no commercial benefit from their social media posts, the Clubs do not need to advertise, the social media posts are inconsequential, and Genesis was solely responsible for the posts. Thus, they argue, a genuine issue of material fact exists on the commercial benefit element of the Models' invasion of privacy by misappropriation claim.

## A. Applicable Law

Invasion of privacy is an intentional tort. *Doggett v. Travis Law Firm, P.C.*, 555 S.W.3d 127, 130 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (citing *Billings v. Atkinson*, 489 S.W.2d 858, 860–61 (Tex. 1973)). Texas recognizes three separate types of invasion of privacy: (1) intrusion upon seclusion or solitude or into one's private affairs; (2) public disclosure of embarrassing private facts; and (3) wrongful appropriation of one's name or likeness. *See Cain v. Hearst Corp.*, 878 S.W.2d 577, 578 (Tex. 1994) (discussing cases recognizing each type of privacy right).

The three elements of a claim for invasion of privacy by appropriation of name or likeness are (1) the defendant appropriated the plaintiff's name or likeness for the value associated with it, and not in an incidental manner or for a newsworthy purpose; (2) the plaintiff can be identified from the publication; and (3) there was some advantage or benefit to the defendant. *Matthews v. Wozencraft*, 15 F.3d 432,

16

437 (5th Cir. 1994); *Henley v. Dillard Dep't Stores*, 46 F. Supp. 2d 587, 590 (N.D. Tex. 1999); *United Locating Servs., LLC v. Fobbs*, 619 S.W.3d 863, 871 (Tex. App.—Houston [14th Dist.] 2021, no pet.); *Doggett*, 555 S.W.3d at 130; *see also Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 900 (Tex. App.—Dallas 2001, no pet.). In general, an appropriation becomes actionable when the name or likeness is used "to advertise the defendant's business or product, or for some similar commercial purpose." *Watson v. Talia Heights, LLC*, 566 S.W.3d 326, 330 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (quoting *Express One Int'l, Inc.*, 53 S.W.3d at 900). If a defendant appropriates a plaintiff's name or likeness for his own commercial advantage, he necessarily derives a benefit from its use. *Henley*, 46 F. Supp. 2d at 596.

The plaintiff is not required to show that the defendant made money from the commercial use of the name or likeness. *See id.* at 597 ("It is immaterial that Defendant made little profit after the ad ran, only ran the advertisement once, and received no feedback on the ad."). Nor is the plaintiff required to prove the defendant's use of the plaintiff's name or likeness "worked." *Id.* "[The d]efendant should not be shielded from liability because the product promoted is undesirable, the ad [is] clumsy or somehow ineffective, or sales slump[ed] during the relevant time period." *Id.* (internal quotation omitted). "The right of publicity has been defined as the inherent right of every human being to control the commercial use of

17

his or her identity . . . ." *Souza v. Mirage Ent., Inc.*, No. 2:21-CV-00015, 2023 WL 8936699, at *2 (S.D. Tex. Dec. 27, 2023) (internal quotation omitted). Rather, the plaintiff must prove that the defendant received a commercial benefit from use of the plaintiff's name or likeness that, without the plaintiff's image, he would not otherwise have received. *See Henley*, 46 F. Supp. 2d at 597.

**B.      Summary Judgment Motion**

In their summary judgment motion, the Models asserted that they conclusively established all three elements of their misappropriation claim as a matter of law.

**1.  *Appellants appropriated the Models' likenesses or images for their value rather than incidentally or for a newsworthy purpose.***

In support of this element, the Models pointed to Cowart's testimony that she had viewed the Models' images—thirty-six "Centerfolds images," fifteen "Splendor images," and twenty-three "Treasures images"—and identified them as posts appearing on the Clubs' Facebook pages. Cowart testified that appellants hired Genesis to manage their marketing, including their social media accounts, and to post images on their pages. She testified that appellants paid Genesis $5,100.00 per month for their services. Cowart testified that the Clubs' general managers provided Genesis with information regarding food and drink specials and promotions, and Genesis created the advertisements for the Clubs. She testified that the Clubs' owners had the ability to limit access to the Clubs' social media accounts to Genesis

18

only.  The owners could also direct Genesis to remove content from their social media accounts.

The Models argued that appellants appropriated their images to sell the experience of nude women interacting with the customer base; stated differently, the purpose of the advertising was to get customers into the Clubs.  In support of their argument, the Models pointed to the following excerpts from Cowart's testimony:

Q. Right. They're all strip clubs where men can go or women can go and watch beautiful women take off their clothes, interact with them, have a drink with them, those types of things, right?

A. Correct.

Q. So is that what these clubs are selling, that experience?  In other words, the ability to go and see beautiful women dance and take off their clothes and have that interaction?

A. Yeah.

Q. Okay.  And that's why you're putting beautiful women in your advertisements, correct, in order to basically show what goes on at the club, correct?

A. I mean, I use the beautiful – in my experience, the beautiful women that we use are usually our dancers.  So in that scenario, it makes sense to use them and put up an advertisement.  Because if an individual comes as a result of the advertisement, they're not going to be angry when they get there because the person they're looking for from the photo will actually be there dancing.

Q. Right.  So it's a reasonable assumption that in the advertising, you know, I'm looking at a woman who I can actually go to one of these clubs and see and interact with.  Is that a fair statement?

A. Yes.

Q. And that's why you're using women in the advertisements, correct? Because you want to portray these businesses as a place where I can go, as a male in that demographic or a female that's interested in that sort of thing, I can go and see this beautiful woman in the ad take off her clothes and maybe talk to her, buy her champagne or whatever?

A. Yes.

. . .

Q. Okay. And then you testified earlier that the purpose of using the beautiful women in the advertisements was to at least let people know what goes on in the club, correct?

MR. MOSCOWITZ: Object to the form.

A. Technically my testimony earlier was that we use – we like to use our beautiful women so that the customers, if they see them and they come to the club, they'll be able to see the girls that they saw in the advertisement.

Q. Okay. And then would you agree with me that, you know, it's virtually impossible to make a distinction between the images of my clients and the images of your dancers with respect to these ads unless you have the behind-the-scene knowledge that you do?

A. Correct.

Q. Okay. And then, again, the purpose of these ads in Exhibits 2, 3, and for Centerfolds, Splendor, and Treasures, was – whether it's working or not, the purpose is to get the clubs out to the public, correct?

MR. MOSCOWITZ: Object to the form.

A. Correct.

It is undisputed that neither appellants nor Genesis had permission to use the Models' images in advertisements for the Clubs.

## 2. *Each model can be identified from the advertisement.*

In support of this element, the Models pointed to Exhibits A through P attached to their motion for summary judgment. These exhibits are the sworn declarations of each of the sixteen models and include the images of each model that appeared in the Clubs' advertisements. In the declarations, each model identified herself as the model whose images were inserted into the Clubs' advertisements at issue.

## 3. *Appellants received an advantage or benefit from the misappropriation.*

The Models argued that the summary judgment evidence established that appellants used their images without permission and that they received a benefit from the misappropriation of those images. They pointed to Cowart's testimony that the Clubs sell the experience of seeing the women who have appeared in the advertisements and interacting with those women at the Clubs, and that the purpose of the advertising is to get customers into the Clubs.

The Models further argued that Cowart's testimony made clear that appellants were aware of the fact that an image has value and that its usage must be bargained for if it is to be used to advertise and market the Clubs. Cowart testified:

> Q. I'm asking if you've ever spoken to any person who has appeared in advertisement for your clubs?
>
> A. Yes.

Q. Okay. Who have you spoken to that [has] appeared in the advertising?

A. That I can think of right now, there was one girl who was dancing, was Crystal Star. She agreed to have her photos taken and used as our advertisement. And she was a current or not a current but at the time her photo was used, she was an active dancer. So obviously I had conversations with her because she worked on a daily basis.

Q. Okay. So when you spoke to – let's call her Crystal – when you spoke to Crystal, did you approach her or did she approach you about appearing in the advertising?

A. No, she approached me.

Q. All right. And so she said I'd like to appear in advertising for the club. What conversations did you have or what agreement did you work out with Crystal to appear in an advertising?

A. I had her sign the required release. And the agreement was in exchange for her – the use of her image in our advertisement, she would receive 20 free floor fees. So for 20 times that she came to work, she wouldn't have to pay a floor fee.

Q. How much is a floor fee?

A. It ranges depending on what time you get there.

Q. What's the range?

A. Anywhere from free to $50.

Q. Okay. So can we split the difference with an average of 25 bucks?

A. True.

Q. And then that all depends on what time you get there, correct?

A. Correct.

22

Q. So 25 times 20 – I'm not a good mathematician, but that's 500 bucks, correct?

A. Yes.

Q. Okay. So $500 consideration and a release was what you negotiated with Crystal to appear in the advertising, correct?

A. Correct.

The Models asserted that despite knowing that images have value and that their usage must be bargained for, appellants neither bargained for nor paid the Models to use their images in the Clubs' social media advertisements. The Models further asserted that "[i]n addition to the benefit and advantage of getting something for nothing, [appellants] continued to attract patrons to [their] club[s] for years with the posting and re-posting of [the Models'] images."

## C.    Summary Judgment Response

Appellants' summary judgment response challenged only the third element of the Models' misappropriation claim. They argued, as they now do on appeal, that the Models produced no evidence that appellants had received a commercial benefit from their social media posts that, without such posts, the Clubs would not have otherwise received. In support of their argument, appellants pointed to the following excerpt from Cowart's deposition testimony:

Q. Okay. Let me ask you a broader question. With respect to this advertising, what's – why do the clubs advertise?

A. Can I be blunt here?

23

Q. Yeah. I mean, I – you're under oath.

A. I want to be one hundred percent honest with you, we don't need to advertise. We have our clientele. Regardless of which establishment we're discussing, regardless of its location, if a customer is going to come to that type of establishment, I don't need to advertise; that man is coming regardless. So advertisement is really, in my 20 years, very, very limited.

Citing *Henley*, appellants argued that "the mere fact that [the ad] was published and the defendant [] intended to make a profit from the [ad] is not enough to constitute commercial benefit." *Id.* at 596. Appellants emphasized that "Ms. Cowart, with over 20 years of experience in the male entertainment industry, testified that Facebook posts do not increase revenue or business 'at all.'"

When Cowart was later asked about her previous testimony, she testified:

Q. Okay. Well, let me ask you kind of an obvious question with respect to your prior answer about advertising. I mean, if Centerfolds and Splendor, Cover Girls and Treasures don't need to advertise, then why are you paying, you know, 64 or $6,600 a month between Night Moves and Genesis to advertise?

     MR. MOSCOWITZ: Object to the form.

A. I mean, realistically, I think we pay Genesis and – to do Facebook because someone told the Davari brothers that it would be a good idea to advertise on Facebook. But it generates no – it doesn't increase our revenue, at least in my personal opinion. It doesn't increase our business at all, these – these Facebook ads and Night Moves.

Q. Okay. And you said that that's your personal opinion. Is that something you track or have data to support, or is that just your observation based on 20 years of doing this?

24

A. I have no data with respect to revenue, but just my observations from 20 years.

When viewed in the light most favorable to appellants, Cowart's testimony is more than a scintilla of evidence raising a fact issue as to whether the Clubs received a commercial benefit in the form of increased revenue or foot traffic as a result of appellants' use of the Models' images in their social media advertisements. *See Neely v. Wilson*, 418 S.W.3d 52, 59 (Tex. 2013).

This conclusion, however, does not end our analysis. In support of the commercial benefit element of their misappropriation claim, the Models also produced evidence that appellants used the Models' images in their social media advertisements over several years, without their permission, and without compensating them for the use of those images. Cowart's testimony that appellants had previously bargained with and compensated another dancer for the use of her image, together with the undisputed evidence that appellants did not pay the Models for the use of their images in the Clubs' advertisements, is evidence that appellants received a benefit in the form of free advertising.

In response, appellants argued that the Models' assertion that appellants received a benefit, based on Cowart's testimony about appellants' use of another dancer's image in an advertisement for the Clubs for which they bargained and compensated the dancer, is nothing more than a conclusory statement that cannot support summary judgment. We disagree. A conclusory statement is one that does

not provide the underlying facts to support the conclusion. *See Wills v. USAA Gen. Indem. Co.*, No. 01-22-00304-CV, 2023 WL 8459498, at \*5 (Tex. App.—Houston [1st Dist.] Dec. 7, 2023, no pet.) (mem. op.); *see also Conclusory*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "conclusory" as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based."). Here, the Models' assertion that appellants received a benefit when they used their images without paying for them is based on summary judgment evidence showing that appellants recognized that images have value and must be bargained for, as demonstrated by the fact that appellants had previously compensated another dancer for the use of her image in the Clubs' advertisements. By appropriating the Models' image or likeness, appellants received the benefit of years of free advertising for their Clubs without seeking permission or paying for their use. *See Henley*, 46 F. Supp. 2d at 597 ("By appropriating Plaintiff's name or likeness, Defendant received the benefit of a celebrity endorsement without asking permission or paying a fee."). Appellants have not produced any evidence raising a material fact issue on this point. *See Buck*, 381 S.W.3d at 527 (noting undisputed evidence may be conclusive of absence of material fact issue).

The Models have conclusively proved each element of their invasion of privacy by misappropriation claim. We hold that the trial court did not err in

26

granting summary judgment on the Models' misappropriation claim.[5] We overrule

appellant's first issue.

---

[5]    In *Souza v. Mirage Entertainment, Inc.*, No. 2:21-CV-00015, 2023 WL 8936699 (S.D. Tex. 2023), the district court considered a similar misappropriation claim brought by professional models, spokesmodels, actresses, and social media influencers who sued the defendant for using their likenesses in advertisements for Defendant's strip club without authorization or compensation. *See id.* at *1. The plaintiffs sought judgment as a matter of law on their claims. *See id.* The U.S. Magistrate Judge issued a memorandum and recommendation recommending that the plaintiffs' motion be denied in its entirety because there were disputed issues of material fact precluding judgment as a matter of law on each of the asserted claims. *See id.*

The district court judge disagreed, finding that the plaintiffs had demonstrated as a matter of law that they satisfied the "commercial benefit" element of their misappropriation claim. *See id.* at *3-4. In particular, the court noted:

> As Defendant's own witness testified, it used images for free when it might have paid $500 for them under an arm's length negotiation (considering his limited budget). Consequently, the evidence shows that these are images of a value he could not otherwise afford or use— if Plaintiffs were to set their own price or refuse to allow it to use their images, as they testified in their affidavits. Defendant also recognized some benefit or advantage because it continually used the images in its advertising strategy to bring in customers and sell drinks.
>
> . . . .
>
> It is clear that Defendant perceived value in appropriating the images for its advertising. And it obtained the advantage of using images it could not afford. Thus, Plaintiffs have demonstrated as a matter of law that the third element is satisfied: Defendant received some benefit or advantage.

*Id.*

## Negligence Claim

In their second issue, appellants contend that the trial court erred in granting summary judgment on the Models' negligence/respondeat superior claim. They assert that while the Models argued that appellants were negligent in failing to implement or adhere to policies to prevent misappropriation of the Models' images or, if policies were in place, failing to enforce them in a manner that did not cause injury to the Models, they did not provide any evidence that appellants created any of the social media posts themselves, had final approval or authority over the use or dissemination of any such advertisements, or that appellants controlled the dissemination of any such advertisements. Appellants argue that they presented evidence establishing the opposite—that their third-party vendor, Genesis, was solely responsible for creating and posting the social media content. They assert that the summary judgment evidence does not support summary judgment on a direct liability theory (negligence or negligent undertaking).

## A. Respondeat Superior

Generally, a person has no duty to control the conduct of another. *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983). Under the doctrine of respondeat superior, however, an employer may be liable vicariously for the negligent acts of its employee if the employee's actions are within the course and scope of his employment. *See Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 131 (Tex.

2018).  Within the "course and scope of employment" means within the scope of the employee's general authority, in furtherance of the employer's business, and for the accomplishment of the object for which he was hired.  *Id.* at 132 (quoting *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007)).  "An employer is not responsible for what occurs when an employee deviates from the performance of his duties for his own purposes."  *Id.* at 137.

Intentional torts may still meet the standard "when the act, although not specifically authorized by the employer, is closely connected with the servant's authorized duties."  *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999).  An employer will be held liable for its employee's intentional torts that "stem[] directly from the employee's exercise (however inappropriate or excessive) of a delegated right or duty."  *ANA, Inc. v. Lowry*, 31 S.W.3d 765, 770 (Tex. App.—Houston [1st Dist.] 2000, no pet.).  Course and scope of employment, for purposes of determining an employer's vicarious liability for the acts of its employee or agent, is generally a fact issue.  *See Arbelaez v. Just Brakes Corp*., 149 S.W.3d 717, 720 (Tex. App.—Austin 2004, no pet.); *see also GTE Sw., Inc.*, 998 S.W.2d at 618; *Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 515 (Tex. 1995).  When, as here, one entity contracts with another, there is no vicarious liability unless the one obtaining the other to work "retains some control over the manner in which the contractor

performs the work that causes the damage." *See JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 864–65 (Tex. 2021) (quotations omitted).

In their summary judgment motion, the Models asserted that appellants were vicariously liable under the theory of respondeat superior because Genesis was acting within the course and scope of its employment with appellants when the Models' images were posted to appellants' social media accounts. In support of their assertion, the Models pointed to Cowart's testimony that Genesis was paid by D. Texas Investments, appellants' parent company, and all of the advertisements at issue were advertisements for the Clubs. Each Club owned its own website and social media account where the images were posted, and the Clubs' owners had the ability to order any images or posts be taken down.

With respect to appellants' policy requiring that a signed release be obtained prior to posting, Cowart testified:

> Q. Okay. Since these allegations have become known to you – and, you know, this has been a cycle with COVID and the insurance issues, I mean, this case has gotten kicked down the road. Have y'all made any changes in your agreements with Night Moves and Genesis with respect to imagery used in your ads?
>
> MR. MOSCOWITZ: Object to the form.
>
> A. We – I mean, our policy, with respect to the companies, has been the same from day one. You have to have a release signed by the individual stating that it's okay to use their image.
>
> Q. Is that a written policy?

A. I think so actually.

Q. Do you know where it is?

A. If my memory is serving me correctly, there is a document that was signed by each of my managers where they acknowledge that they're not to post or photograph anyone without a proper release.

Q. When was that signed?

A. I would have to check.

Q. Was it signed before or after the lawsuit?

A. I don't know.

Q. Who created that document?

A. I don't know.

. . . .

Q. Okay. And that document has [the] signature of each manager stating that they're not going to post content without a written release, correct?

A. That's my general, off the top of my head, recollection of the language in the contract, but yes.

Q. Okay. And is that part of the employment agreement you have with the general managers?

A. It is not part of their actual employment agreement. It was a separate notice.

Q. Okay. And, again, you don't remember if that's before or after this lawsuit?

A. I don't know.

Q. Okay. Do you know why it was implemented?

A. I mean, it's important to make sure that everyone is aware and remembering what our rules are and our policies are.

Q. Do you have the same agreement with Genesis?

MR. MOSCOWITZ: Object to the form.

A. With respect to posting of images?

Q: Yeah. That – in other words, if they're going to post content advertising your clubs on your website and bring business into your clubs, that they need to have a release from the people that they're using to advertise the clubs?

MR. MOSCOWITZ: Object to the form.

A: Yes, we do.

The Models asserted that the evidence showed that, ultimately, appellants had control over the Clubs' websites, including the ability to remove content, and they had policies in place to prevent the misuse of images but they failed to monitor their employees and agents for years, resulting in the misappropriation of the Models' images. As such, appellants are liable for the conduct of their employees and agents under a theory of respondeat superior.

In response, appellants asserted that the Models produced no evidence that appellants had final approval or authority over the use or dissemination of the advertisements at issue, or that they controlled the dissemination of such advertisements. They further asserted that the Models failed to show that Genesis acted within the course and scope of its authority by posting images without first

obtaining releases. They pointed to Cowart's testimony, attached as summary judgment evidence to their response, showing that Genesis alone handled both the selection and posting of images for the Clubs' advertisements, and that the only content supplied by the Clubs related to food and drink specials, which Genesis incorporated into the posts it created. They also pointed to the undisputed evidence that appellants maintained policies applicable to Genesis, as their third-party vendor responsible for social media posts, that required Genesis to first obtain a release prior to posting content for the Clubs. Appellants argued that by posting images of the Models without a release, Genesis acted outside the course and scope of its agreement with appellants and outside the scope of its authority. Thus, they argued, the Models failed to establish that appellants breached a duty to them because Genesis's actions, which fell outside the scope of the authority appellants granted to Genesis, could not be imputed to appellants under a negligence or respondeat superior theory of liability.

Viewing the evidence in a light most favorable to appellants, as the nonmovants, we conclude that they have presented more than a scintilla of evidence raising a fact question regarding whether Genesis acted within the course and scope of its authority. *See Neely*, 418 S.W.3d at 59; *see also Arbelaez*, 149 S.W.3d 720 (noting course and scope is generally fact issue).

33

## B.	Negligent Undertaking

Generally, Texas law imposes no duty to take action to prevent harm to others absent certain special relationships or circumstances. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000); *Garcia v. Kellogg Brown & Root Servs., Inc.*, No. 01-19-00319-CV, 2020 WL 3820426, at \*6 (Tex. App.—Houston [1st Dist.] July 7, 2020, no pet.) (mem. op.). However, one who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person or property will not be injured by the undertaking. *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119 (Tex. 1976). To establish a "negligent undertaking," a plaintiff must show that (1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection,; (2) the defendant failed to exercise reasonable care in performing those services; and either (a) the plaintiff relied upon the defendant's performance, or (b) the defendant's performance increased the plaintiff's risk of harm. *Nall v. Plunkett*, 404 S.W.3d 552, 555–56 (Tex. 2013) (citing RESTATEMENT (SECOND) OF TORTS § 324A (providing rule for liability to third person for negligent performance of undertaking)). The critical inquiry concerning the duty element of a negligent undertaking theory is whether a defendant acted in a way that requires the imposition of a duty where one would not otherwise exist. *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 151 (Tex. 2022). Thus, to succeed on their negligent

undertaking theory, the Models had to show that appellants undertook, gratuitously or for consideration, to render services that they knew or should have known were necessary for the protection of the Models' person or things and either (1) failed to exercise reasonable care and increased the risk of physical harm to the Models or (2) harm resulted because of the Models' reliance on the undertaking. *See id.* at 151.

In support of their negligent undertaking claim, the Models asserted that appellants "assumed a duty by choosing to use the images of any model for commercial purposes and were charged with exercising that duty in accordance with the proper standard of care," and they "had a duty to ensure that they had all the rights to use the materials they ultimately used and republished." Appellants' summary judgment evidence, however, showed that Genesis alone selected and posted the images for the Clubs' advertisements, and that the only content supplied by the Clubs related to food and drink specials, which Genesis incorporated into the posts it created. The Models have presented no evidence that appellants undertook to render any services to them.

The Models failed to conclusively prove, and genuine issues of material fact exist as to, both of their negligence theories. *See Clarent Energy Servs.*, 2020 WL 1173706, at *6–7. We hold the trial court erred when it granted summary judgment

in favor of the Models on their negligence claims.  We sustain appellants' second issue.[6]

## Damages

In their third issue, appellants assert that the trial court improperly awarded unliquidated damages to the Models in excess of $1.4 million as a matter of law. They argue, among other things, that the damages sought are highly subjective and not readily susceptible to objective, conclusive calculation and, as such, are a fact issue for the jury.

In its final judgment, the trial court awarded $1,405,000.00 in damages to the Models, divided among each of the Models as set forth below:

| Plaintiff | Damages |
|-----------|---------|
| Skinner | $160,000 |
| Middleton | $60,000 |
| Gaxiola | $30,000 |
| Zharinova | $15,000 |
| Hinton | $200,000 |
| Posada | $210,000 |

---

[6] Following oral argument, with leave of court, appellees filed a supplemental brief to address the election-of-remedies doctrine and appellants filed a supplemental response brief.  Both parties concluded in their supplemental briefing that the election-of-remedies doctrine does not apply in this case.  In their brief, appellants request that we award them damages under Rule of Appellate Procedure 45 to compensate appellants for their attorney's fees and costs incurred in responding to appellees' supplemental brief which they contend is objectively frivolous.  We deny appellants' request. *See Smith v. Brown*, 51 S.W.3d 376, 381 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (holding decision to grant appellate sanctions is matter of discretion that appellate court exercises with prudence and caution).

| | |
|---|---|
| Pinder | $40,000 |
| Canas | $105,000 |
| Valencia | $45,000 |
| Toth | $240,000 |
| Farrell | $40,000 |
| Sears | $20,000 |
| Swedberg | $100,000 |
| Quy | $40,000 |
| Gibson | $60,000 |
| Turner | $40,000 |

The damages award was based on Chamberlin's expert reports.

A claim is liquidated if the amount of damages caused by the defendant can be accurately calculated from the factual, as opposed to conclusory, allegations in the petition, and an instrument in writing.[7] *2017 Yale Dev. LLC v. Holtzapple Neal*

---

[7]  Documents that courts have found to constitute written instruments in this context include contracts, lease agreements, tax records, receipts, and invoices. *See, e.g.*, *Ingram Indus., Inc. v. U.S. Bolt Mfg., Inc.*, 121 S.W.3d 31, 37 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (concluding damages had "the appearance of being liquidated because they seem[ed] capable of proof by written instruments" but should have been treated as unliquidated because "written instruments, such as invoices or receipts, were not produced along with the [general manager's] affidavit"); *Aavid Thermal Techs. of Tex. v. Irving Indep. Sch. Dist.*, 68 S.W.3d 707, 711 (Tex. App.—Dallas 2001, no pet.) (concluding certified copies of tax rolls and tax statements were written instruments from which taxes could be calculated in suit to recover delinquent ad valorem taxes); *Novosad v. Cunningham*, 38 S.W.3d 767, 773 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (holding suit to recover amount due for professional accounting services was liquidated claim proved by written instruments where plaintiff attached original invoices to verified petition); *Mantis v. Resz*, 5 S.W.3d 388, 392 (Tex. App.—Fort Worth 1999, pet. denied) (in suit on sworn account, holding claim was liquidated where trial court had before it original petition with attached sworn account and verification of sworn account by affidavit); *Sheshunoff & Co., Inc. v. Scholl*, 560 S.W.2d 113, 116 (Tex. Civ. App.—Houston [1st Dist.] 1977) (holding, in suit to recover damages for breach of employment contract, claim for damages was liquidated and proved by

*Props. Grp. LLC*, 01-23-00305-CV, 2025 WL 1225107, at *8 (Tex. App.—Houston [1st Dist.] Apr. 29, 2025, no pet.) (mem. op.); *Dansk Express, LLC v. IPFS Corp.*, 01-22-00621-CV, 2023 WL 4937497, at *8 (Tex. App.—Houston [1st Dist.] Aug. 3, 2023, no pet.) (mem. op.); *Okorafor v. Lewis*, No. 14-08-00130-CV, 2010 WL 1343125, at *3 (Tex. App.—Houston [14th Dist.] Apr. 6, 2010, no pet.) (mem. op.). Damages that do not fit into this category are unliquidated. *Okorafor*, 2010 WL 1343125, at *3.

Unliquidated damages encompass most personal injury damages because they are not susceptible to precise calculation. *Id.* "Tort actions almost always involve unliquidated damages." *Kennedy v. Aattaboy Termite & Pest Control, Inc.*, No. 09-19-00109-CV, 2021 WL 1567225, at *3 (Tex. App.—Beaumont Apr. 22, 2021, no pet.) (mem. op.). "[B]ecause there is no way to quantify the value of unliquidated damages *as a matter of law,* an award of such damages necessarily must be decided by the trier of fact rather than summary judgment." *Okorafor*, 2010 WL 1343125, at *3 (citing *Rivera v. White*, 234 S.W.3d 802, 806 (Tex. App.—Texarkana 2007, no pet.) ("Summary judgment is rarely appropriate when the issue is inherently one for the trier of fact to decide in cases involving unliquidated damages.")); *see Priority One Title, LLC v. Andrado*, No. 14-21-00379-CV, 2023 WL 2259092, at *8 (Tex.

---

employment contract attached to petition), *rev'd on other grounds*, 564 S.W.2d 697 (Tex. 1978).

App.—Houston [14th Dist.] Feb. 28, 2023, no pet.) (mem. op.) ("Rarely, if ever, should unliquidated damages be awarded in a summary judgment.").

Appellants argue that the Models' damages cannot be accurately calculated from the pleadings and summary judgment evidence. We agree. In their petition, the Models sought "[p]ecuniary damages resulting from the unauthorized use of [their] images and likeness[es] in the past and in the future." The Models stated in their declarations, attached as summary judgment evidence to their motion, that they never worked with the Clubs or entered into any agreement with the Clubs. *See Star Elec., Inc. v. Northpark Off. Tower, LP*, 01-17-00364-CV, 2020 WL 3969588, at *16 (Tex. App.—Houston [1st Dist.] July 14, 2020, no pet.) (mem. op.) ("The term 'liquidated damages' generally refers to an acceptable measure of damages that the parties stipulate in advance will be assessed in the event of a breach of their contract."); *Kennedy*, 2021 WL 1567225, at *3 ("The difference between liquidated and unliquidated damages is clear. . . . [L]iquidated damages exist 'when the parties to a contract have agreed in advance on the measure of damages to be assessed in the event of default.' In contrast, unliquidated damages are damages 'that have not been previously specified or contractually provided for.'") (quotations omitted). Although Chamberlin stated in his reports that he reviewed documents provided by the Models in calculating a damage award—contracts and agreements, contractor 1099 forms, employee W-2 forms, earnings statements, and releases and related

records—these documents pertain solely to work the Models did for other clients, not appellants. *See Kennedy*, 2021 WL 1567225, at \*3 ("And while Aattaboy supported its traditional motion with an affidavit from a CPA, which describes Aattaboy's damages and is consistent with the summaries Aattaboy provided with its motion, the opinions of a damage expert drawn from such evidence is not the same as conclusive proof on which no reasonable person would disagree."). Chamberlin further stated that his calculations of the fair market value for each Model's images used by appellants "are estimations in support of actual damages sustained by the Models . . . ."

The Models' damages are unliquidated because they cannot be accurately calculated from reviewing the petition or written instruments on file. *See Clear Lake Ctr., L.P. v. Garden Ridge, L.P*., 416 S.W.3d 527, 545 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Okorafor*, 2010 WL 1343125, at \*3. The trial court thus erred in awarding them as a matter of law. *See City of Keller*, 168 S.W.3d at 816. We sustain appellants' third issue.

## Remedy on Appeal

We have concluded that fact issues precluded summary judgment in favor of the Models on their negligence claims but that the Models were entitled to summary judgment on their misappropriation claim. Notwithstanding, we are compelled, under Texas law, to reverse the judgment and remand for a new trial on both

40

damages and liability. *See Clear Lake Ctr*., 416 S.W.3d at 545; *Okorafor*, 2010 WL 1343125, at \*1.

Texas Rule of Appellate Procedure 44.1 states that even if error affects only part of the trial court's judgment, we "may not order a separate trial solely on unliquidated damages if liability is contested." TEX. R. APP P. 44.1(b); *see also Rancho La Valencia, Inc. v. Aquaplex, Inc*., 383 S.W.3d 150, 151–52 (Tex. 2012). This rule applies when we reverse a summary judgment because of the plaintiff's failure to conclusively prove damages. *See Okorafor*, 2010 WL 1343125, at \*4; *see also Rosales v. Williams*, No. 01-09-00454-CV, 2010 WL 457536, at \*6 (Tex. App.—Houston [1st Dist.] Feb. 11, 2010, no pet.) (mem. op.) (reversing summary judgment for landlord and remanding to trial court because damages were not conclusively established for breach of residential lease, liability was contested by filing general denial, and damages were unliquidated).

Appellants contested liability by filing a general denial. *See Estrada v. Dillon*, 44 S.W.3d 558, 562 (Tex. 2001) ("If a party files a general denial in the trial court, that pleading puts a plaintiff to his or her proof on all issues, including liability; its effect extends to contesting liability in the event of remand on appeal."). And the damages in this case are unliquidated because they cannot be determined from reviewing the petition and written instruments on file. *See Clear Lake Center*, 416 S.W.3d at 545; *Okorafor*, 2010 WL 1343125, at \*3. Because Rule 44.1(b)

41

proscribes a separate trial on unliquidated damages when liability is contested, we must reverse the trial court's judgment on liability as well as damages.[8] *See* TEX. R. APP. P. 44.1(b); *Estrada*, 44 S.W.3d at 562.

## Conclusion

In accordance with Texas Rule of Appellate Procedure 44.1, we reverse the trial court's judgment and remand the case for a new trial on liability and damages.

We dismiss any pending motions as moot.

Kristin Guiney
Justice

Panel consists of Justices Rivas-Molloy, Guerra, and Guiney.

---

[8] We do not address appellants' argument that we should decline to consider Exhibit U as it is unnecessary to the disposition of the appeal. *See* TEX. R. APP. P. 47.1.